Good afternoon. May it please the court, my name is Melinda Cantrell, and I represent the petitioners who are the defendants and appellants in the action. Excuse me a quick comment. Sgt. David Valentine, Custody Assistant Christopher Solomon, the County of Los Angeles, and the Los Angeles County Sheriff's Department. Defendants respectfully submit that the panel applied an improper standard to determine qualified immunity in this case. As the Supreme Court has repeatedly reiterated, in analyzing qualified immunity and determining a clearly established law, the court needs to look at the specific context of the case and the particular circumstances facing the officer at the time of his particular conduct, and not as a broad general proposition of law. But counsel, there's no question, is there, that people who are incarcerated or entitled to be free from violence at the time that they're inmates, are they not under the former case? Well, that is true, your honor. However, framing it in that manner is much too general of a proposition of law. If qualified immunity... Why is that? I mean, that's pretty specific. I mean, you don't have to be beaten up by people while you're in jail. I mean, how more specific do you have to have? Right to the jaw, left to the knee? What do you have to have? Well, you need to have notice to the officers that their particular conduct is going to be violating clearly established right. And in deliberate indifference cases, as stated by the court in Florida, the law is unclear at what point some risk... But that's the 8th Amendment issue. This is the 14th Amendment issue, is it not? That is true, but I would re-speculate. It's the same standard, right? No, your honor. I would respectfully submit that the Ninth Circuit applies the same standard, and it's deliberate indifference and failure to protect from a substantial risk of serious harm. And there's both an objective and subjective component. After Kingsley, is that still correct? Yes, your honor. After Kingsley, that is still correct. Why? Because Kingsley, I would submit, nothing in Kingsley overturned circuit precedent, requiring a subjective component to deliberate indifference cases. And in fact, I think Kingsley actually strengthens the argument by emphasizing in the opinion that the defendant must have intended the injury-causing force, which directly caused his harm. The Supreme Court stated a use of force must be deliberate, i.e. purposeful and knowing, because liability for negligently inflicting harm is categorically beneath the standard to establish a due process violation, which does not occur from an unintended injury. So in Kingsley, the Supreme Court emphasized that there must be deliberate intents to prove that the force was not accidental, that the delusional force the defendant meant to cause that act. So similarly, you must have deliberate versus accidental indifference in order to ensure that liability does not attach for mere negligence. And I would respectfully submit that the Supreme Court actually put this matter to rest in Davidson v. Cannon, which in that case, the plaintiff pursued a negligence claim, and he claimed negligence in the failure to protect him from harm from an attack by another inmate. In that case, the inmate sent a note indicating that the attacking inmate had threatened to cause him harm, and the officer actually forgot about the note, and he was attacked. Isn't that an Eighth Amendment case also, though? Well, no. That's a Fourteenth Amendment case, and the Supreme Court said that negligently inflicting harm was categorically beneath due process. So you can't have a violation. But what did they say was categorically beneath due process? I misspoke. You can't have a due process violation based on negligence because negligence is categorically beneath the standard to prove a substantive due process of law. So negligence or reasonableness won't suffice for that standard. You're saying the objective standard does not apply in Fourteenth Amendment pretrial cases. Is that what you're saying? That's exactly right, Your Honor. You need to have an objective and a subjective component to be met. But you're relying on Kingsley for this Davidson case? I think Davidson, Kingsley, and existing precedents of the Ninth Circuit, Clothier, Ford, all the Ninth Circuit law, Frost, Redmond, apply Eighth Amendment to Fourteenth Amendment standards, and there's nothing in Kingsley that specifically holds the standard has changed in deliberate indifference failure to protect claims without a subjective component for such claims. Then you're going to end up having liability where an officer did not intend an injury, and that is the standard of negligence. The officer or defendant must be aware that he has subjected the inmate to the injury causing risk. If he does not know that he has done those things, it's just going to be liability based on negligence, which is insufficient to establish a violation. But what was wrong with the jury instruction here? It sounds like you just articulated basically how the jury was instructed as to the individual claims. What was wrong with the jury instruction in our case here? Well, I would submit that qualified, despite the jury's finding of a substantial risk of serious harm, that does not preclude the reviewing court from deciding qualified immunity. That's a separate analysis. That was my question as well. So once the jury has found the underlying constitutional violation, let's assume that because this is no mission case, it would have to be a determination that Solomon and Valentine here consciously disregarded a substantial risk of serious harm by putting Gonzalez's in Castro's cell. So once they found that, how could we say that any reasonable juror, any reasonable officer in Solomon and Valentine's position could think that that was constitutional, when the jury has already found the underlying violation and consciously disregarded a substantial risk? Because qualified immunity is a separate inquiry, because deliberate indifference has an objective and subjective component, despite the jury's finding that these defendants knew of a substantial risk of serious harm, that does not mean that every single reasonable officer would have recognized a substantial risk of serious harm. And in Farmer, the court said prison officials who actually knew of a substantial risk of serious harm may be found free from liability if they responded reasonably to the risk. But so if the jury finds that these individuals consciously disregarded a risk of substantial harm in the situation, they would still have qualified immunity, because that is a reasonable officer. So you're saying the jury said they could have been unreasonable in specifically knowing that there was a risk of substantial harm. Because just because these officers knew of a substantial risk of serious harm, does not mean every single officer would have known of a substantial risk of serious harm. And if their conduct could be found reasonable under the clearly established law, existing precedence, which is a fact-bound inquiry looking at other cases, then the officers are entitled to qualified immunity. I cited a case, Luckard v. Dodge County, by the Eighth Circuit, where there was liability found for deliberate indifference under the 14th Amendment. And the court said that they could still properly grant Rule 50B, Motion of Qualified Immunity, because the court should defer factual findings to what the jury found, but it can then perform its separate qualified immunity analysis, because there is an objective component to a failure to protect an inmate from harm case. I think I understand your argument, but I'd like to talk about the county, the Monell liability. Yes. Is there anything in the record to suggest that the county was aware of the deficiencies in the severing cell at the West Hollywood Station prior to this litigation? No, and what I would respectfully submit, Your Honor, I would like to emphasize that the Monell claim went to the jury as a custom and practice claim. That's all that went to the jury. So this discussion about whether the design of the cell was a policy that violated the plaintiff's rights is a theory based on an express policy. That was not a claim that was submitted to the jury at the time of trial. There was only a custom and practice claim and only custom and practice jury instructions. There was only custom and practice questions submitted to the jury on the verdict form, and actually the exact question was, did the County of Los Angeles Sheriff's Department have a longstanding custom and practice that was deliberately indifferent to a substantial risk of serious harm held in the West Hollywood detoxification cell? So there was no express policy even raised or pursued at trial. So I would submit respectfully that the design of the cell is not a policy as found by the Sixth Circuit in the Moulton v. Cleveland. Can I ask you, I mean, I'm far right there. I'm far left. I tend to agree with you about the policy not being the design of the cell, but why don't we just look at the customer policy or customer practice, rather, as being putting folks in the sobering cell with the level of visual and audio surveillance that the cell actually had. Surely the county is aware of whatever the standard practice is, and so even if you did not, let's say, have to have the video camera or some kind of a microphone in there, the jury nonetheless was asked to decide, is the level of surveillance that does exist, is this constitutionally adequate, and found that it wasn't. I guess that seems to me just a straight sufficiency question, and the jury reasonably found that there wasn't enough surveillance by the end of the story. Because respectfully, Your Honor, you can't have a customer practice of using a cell when there's no prior incidence of harm. The panel unanimously and properly found there could be no customer practice claim in this case because there was no prior. Customer practice is just simply putting people in there without any greater level of surveillance that exists. That happens every single day in that jail, I assume. But that was not what actually caused the harm. The cause, according to the plaintiff, was putting the attacking inmate in with the plaintiff, and the county had a policy that assaultive inmates were not to be housed together. But if adequate surveillance had, in fact, been in place, notwithstanding the violation of the county's commendable policy of not putting combative inmates in there with other folks, if adequate surveillance had nonetheless existed, I think the jury was asked to decide would that have stopped the harm, and the jury found that it would have not. It doesn't strike me from a causation standpoint as an irrational finding. Respectfully, Your Honor, I disagree with the way you are framing the Manal claim. I don't think a Manal claim can be framed in that manner. I'm not aware of any cases without prior incidence of harm where there's a widespread informal policy where liability can be found under Manal. Why can't it be the combination, though, of the failure to have surveillance and the putting people together? And I think that is what the jury instruction referred to. It talked about putting highly intoxicated people in the jail detoxification cell without constitutionally adequate visual surveillance and audio monitoring. So it puts the two together. Why can't that be a policy? Because without prior incidence of harm, there can be, like, no widespread practice that has the force of law, the force of policy, just because at this point they couldn't have been aware that there was a risk, then why isn't the law that existed about needing to have surveillance enough to show that they were aware of the risk? Because for a Manal, I disagree, but assuming there's a customary practice, you still have to have deliberative difference. If you're saying a customary practice Manal claim, that's a direct entity policy claim. And so the plaintiff would need to show deliberate indifference in the substantial risk of serious harm. So if you have no prior incidence of problems with housing inmates with this level of surveillance, then you cannot have a deliberate indifference constitutional violation against the county directly under the 14th Amendment. Sorry, go ahead. But what about the regulations, though? Was there anything either in the drafting of the regulations or the legislative history, or were they based on a study that showed that without some level of audio and video monitoring, there was a risk of harm? So I didn't see anything specifically in the language of the regulations themselves, but were there other things that the county might have been aware of? I would say no, and the whole issue that I would have with that is there was no claim presented at trial that the original design of the cell did not comply with the regulations. So we don't really know what the original design of the cell was and whether it did. Was there a grandfather clause at the – is there a grandfather clause that when the plans that we're talking about, that it says that those already in existence don't have to change to this level unless they remodel? Yeah, well, my understanding is under Title 24, those statutes don't necessarily apply if the building predated, you know, when they were enacted. We don't have any evidence because it wasn't presented as an express policy claim. So I don't know if that was not considered by the judge in the meeting and then was not objected to by the defendants in the case when the evidence about the design was placed into evidence? Well, there was some discussion of the audio monitoring, at which point taking the plaintiff's testimony, expert testimony by Roger Clark, at which point the defense counsel objected and said that exceeded the Rule 26 report, and the judge actually had sustained that objection. But in terms of showing an express policy – But the ordinance about requiring monitoring was a jury exhibit. It was one of the exhibits in evidence, wasn't it? That's true. It was Exhibit 34. But we don't know if the regulations were violated. We don't know if the regulations were applicable. And we certainly can't say respectfully on appeal that any violation of those regulations amounted to a substantial risk of serious harm. It might go toward notice, but that would be a determination for the jury if they had been presented with an express policy manel claim, which we don't have in this case. I remember reading the regulations. They said that these regulations applied to locations as to which the architectural design had not yet been completed. So that would mean that they were forward-looking only and that this jail cell had been there, according to the concurring opinion of the panel, for some decades. So it would seem that the regulations didn't apply to this jail cell. Right. That's what I would submit, that there's no evidence that the regulations applied. There's no evidence of what this cell, how it was even designed. We don't know if it was designed in compliance with this regulation and maybe the builder didn't comply with the design or maybe over time the equipment got damaged and wasn't replaced. Wait a minute. I thought the evidence was that the design, in reference to the building code, was put before the jury and that there was no objection to that at the time of the trial by the defense. Is that incorrect? There was no objection to the exhibit. The defense didn't say, hey, there's a grandfather clause. You can't introduce this. It went into evidence without objection. I'm not talking about what happened in the Illuminate session, but what happened in the trial itself. Isn't it correct that the evidence of the California building code went into evidence? It was before the jury and there was no objection by that. Is that correct? I would have to check the record. That may be true. However, that doesn't mean that we don't know whether that regulation was violated at the time of the cell. But does it matter? The existence of the regulation should give the county notice that this is a safety concern, shouldn't it? There's no evidence of how the county would have had to notice that its cell wasn't in compliance because we don't know. Maybe it was originally designed in compliance. Maybe, but it didn't have audio monitoring, did it? There is some, would you say audio monitoring? There is some reference in the record to radio monitoring equipment and it might have been, see this is the thing, the evidence wasn't fully developed because the claim at trial wasn't that the design of the cell was an express policy that violated the county's constitutional rights. But at RT 6553-54, there was some type of radio equipment which was not working. I couldn't tell from the record. It may have been just a monitor where a custodial officer could have talked to the inmates one way. That may have, I'm not sure because that wasn't the claim presented at the time of trial. Let me decide for a moment whether the funnel aspect was qualified, was dealt with. If the evidence that I described, the California Building Code was put into evidence and it wasn't objected to, then we're just dealing with a waiver, right? Whether or not that issue is waived in terms of whether there was a grandfather clause in the plan. When we look at it now, don't we have to determine whether a waiver has occurred or whether there's any exception to the waiver? I would respectfully submit that that regulation can show a custom and practice monology. I understand. I get your point on that. I agree with you as another matter, but I get your point. But the reality is the evidence that was put in, the jury heard it, there was no objection to it. So now there's been a claim that this clothing is grandfathered. And I'm saying for purposes of our analysis, don't we determine whether the grandfather clause should be considered on the basis of normal waiver principles as, for example, in our Rice v. Gonzalez case? Well, I would submit that there was an objection during Roger Clark's testimony. Do you know that or are you suggesting that? No, I know that for sure. There was an objection and that the California Building Code was placed in evidence? Roger Clark started to discuss the audio regulations at the June 6 transcript of page 147. The defense counsel objected and said that wasn't an opinion that they're allowed to present at trial. And the district court, it appears he looked at the Rule 26 report and said, no, you can't. What do you mean by opinion? The regulation is not an opinion. I don't understand what you're trying to tell us. From the record, it is my understanding that he was going to talk about or comment on that regulation. Right, but objecting to a person discussing a regulation is not the same as objecting to the admission of the regulation in the first instance. And I think that was Judge Smith's question to you. The regulation was in evidence. What purpose was it being used to show? That's what I don't understand. And that's where I think that, regardless, it doesn't show anything because the design of the cell, there was no express policy. Did the expert testify that the cell did not meet the regulation? I think that he, not that audio regulation, he commented upon the regulation for video monitoring equipment. But again, we know that there was video monitoring equipment. There was also a viewing slot which looked directly into the cell. And the video monitoring equipment apparently just was angled so that you could only see a small portion of the cell for privacy reasons. But we don't know how it was originally designed or intended to be used. And it doesn't matter, that's my point to what I asked you earlier, it doesn't matter whether you have the design or whether it complied with the regulation because we know what the level of surveillance was. There was plenty of evidence about that. And you guys put on an expert, the plaintiffs put on an expert who said whether that was an adequate level of surveillance. And it seems to me the regulation is utterly irrelevant to the ultimate issue that went to the jury. Well, the ultimate issue is you can't have a custom and practice Manal claim based on deliberative difference. Did you object to this, to instruction number 18? That's the custom and practice, did you object to that? The defense repeatedly objected to the Manal instructions because the Manal claim, the district court said I don't understand this Manal claim. The defense counsel kept saying I don't understand the Manal claim. And actually the plaintiff's attorney also said let me think about it and come back to you tomorrow. The Manal claim in this case was not an adequately framed, recognizable cause of action. So I would say throughout the defense counsel kept saying, Your Honor, this is inappropriate to fashion jury instructions. And also as to the language of constitutionally adequate within the jury instruction on Manal claim, there was another objection. Do you contend that this instruction is incorrect as a matter of law? The Manal instruction? Yes. In what way? Because, first of all, it refers to constitutionally adequate surveillance. This isn't a negligence per se. Please. Paragraph 2. Okay. So that makes it inadequate? This isn't, yes. And this isn't, the whole thing makes it inadequate. This isn't a negligence per se just because there's a violation of a statute. That's not what that instruction says, though. Well, I would say there's no such thing as constitutionally adequate. But it defines what that term means in the next paragraph. I think that's what you're referring to. Well, but I think the whole... It says it's unconstitutional in that it was deliberately indifferent to a substantial risk of serious harm to prisoners in the West when Hollywood jailed a tax vacation cell. What's wrong with that? Because what is the basis for the Manal claim? The custom and practice of using a cell? Putting people in that cell with the level of visual and audio surveillance that you had And the jury was asked, does this fall below the constitutional standard? And it found that it did. But you have to have a subjective and objective component. That's the key question, it seems to me. Why don't you address that? Because I would be, I was inclined to say, putting aside the Kingsley issue, that when you're talking about a municipality, all you can have is an objective version of deliberate indifference. So describe for me what the subjective analysis of the county's deliberate indifference would look like. Because there's a very important distinction when you're talking about deliberate indifference in the terms of a city of Canton cause of action. And when you're saying the municipal policy itself violated the plaintiff's constitutional rights, if you're saying the municipal policy itself was the constitutional violation, the plaintiff must satisfy the state of mind required to show that constitutional violation. How would you do that with a county? Well, there's several ways that have been discussed by the Ninth Circuit in showing subjective knowledge. The entity acts through a policymaker whose subjective intent can be shown. You could show that. But here, where we're talking about arguably an ordinance that could have made the county aware of a safety issue, should they have deposed every county council person to see if anyone knew about the ordinance, how would you go about proving this? Well, they could show, they could get minutes and see if it was ever discussed. They could show that there was specific knowledge, that there was out of compliance with a regulation that wasn't addressed. You could, the panel said also that you could show that similar incidents had been brought to the municipality's attention and not addressed. And I would like to submit, it's very important, if you were going to say there was only constructive knowledge under a city of Canton theory to an entity, that's unworkable in this case where there's no underlying constitutional violation. If you're going to truly apply a city of Canton standard, there must be an underlying constitutional violation by the employee. So the plaintiff must show the employee acted with objective and subjective knowledge. Once you have shown that, then you can try to show that the entity's omission, that there was such a need for a new policy and the adequacy so plain that their omission could constitute notice of deliberate indifference. You cannot do that without an underlying constitutional violation. Well, we have one here, don't we? No, sir, we don't, respectfully. The underlying constitutional violation by the defendants was that they housed the inmates together. The county has a policy that you cannot house assaultive inmates together, and the plaintiff represented at trial that his Monell claim was in no way dependent, excuse me, on the underlying constitutional violation committed by the defendants in this case. So there's no connection between an actual constitutional violation and any omission by the entity defendants. So it would be, first of all, I would say under Supreme Court, under board of commissioners of Bryan County versus Brown and Gibson and our Ninth Circuit prior cases, you would have to show subjective intent by the entity if you're going to pursue a customary practice or a formal policy Monell claim. But even if the court was contemplating adopting some type of city of Kansan standard for the actual substantive constitutional violation of deliberate indifference, you would at least need to have an employee acting with an objective and subjective component to establish an underlying constitutional violation before you could even apply that standard. Otherwise, you have mere negligence. Otherwise, you have the county being liable for, you know, should have known. And that's a negligence standard which has been rejected by the Supreme Court that doesn't establish a due process violation under the 14th Amendment. Your time has expired. May I still have any rebuttal time? No, we'll see. Thank you so much. Good afternoon, Your Honors. I'm here to argue on behalf of the plaintiff and the appellee, Jonathan Castro. Appearing with me today is David Shapiro, who represents various amici curiae. We've asked that he be allowed 10 minutes of my time, more or less, to address issues related to whether the recent Supreme Court decision in Kingsley versus Hendrickson should affect the outcome in this appeal. It's been plaintiff's position. Well, the case was tried, briefed, and decided by the initial panel before Kingsley. We feel that Kingsley should have no effect on the outcome, but certainly for the benefit of the bench and the bar in this. Well, so what difference does it make to Mr. Castro whether the county is held liable? As a practical matter, it makes no difference to Mr. Castro because he gets all the relief in terms of damages and the punitive damages if the ruling denying qualified immunity is upheld. We said that in our identification agreement. Is there a ratification agreement, identification agreement with the county? There is an indemnification agreement. This is expressed in this case. In fact, we asked for a bond. When the appeal was filed, the county filed a motion opposing the bond and said that they would be indemnifying. Is that required, though, with respect to the punitive damages, or does the county have to make a further decision? The county has to make a further decision. So it's not automatic? Only as to the compensatories and the attorney's fees aboard. The punitives were very extensive, weren't they? No, they were stipulated to after the jury made a finding of punitive damage liability, and rather than go through that, I think we figured out what was it. Mr. Martin, what did you do? Mr. Burton, is that right? Yes, thank you. That's been a while. It has been. Mr. Burton, would you explain the theory of your Monell claim? Yes, and I would say that Judge Watford hit the nail on the head. We said from the beginning, and it's in the charging conference that we included in our excerpts of record, Judge Fisher was very explicit on this. She said, I don't want a general Monell instruction. I want you to spell out in the instruction, plaintiff, exactly what the practice, custom, and policy that you're challenging is so the jury can know that and so the circuit will know that. What we said is that it was the practice and custom in the city of West Hollywood, which is policed under contract by the Sheriff's Department, of putting extremely intoxicated people, people that are so intoxicated that they are a threat to their own safety and to the safety of others. That's the only reason they get put in this cell that does not have really any visual surveillance or any audio surveillance. And those are the points that were made in paragraph two of the instruction. Absolutely, and the judge said, I want you to spell out, Judge Fisher, the district court, I want you to spell out exactly what it is, and that's what we said. It's the practice of putting them in the cell. It's not the question of the building of the jail. The jail was built, the jail might have been built back in the days when police cars didn't have seat belts in them or something. I mean, it's an old facility, but there is not a grandfather clause. In fact, there is an anti-grandfather clause, which I think is unusual. It's our excerpts of record, the supplemental excerpts of record, 435. What we did is we put into evidence not only the regulations themselves, which are Title 15 and Title 24 of the California Code of Regulations, but we put in what is called the Station Jail Manual for West Hollywood. So this is a manual prepared by the Sheriff's Department specifically for this jail and was testified to by the jail administrator, Arthur Pinacci, who was a trial witness. And it says, this is the jail manual. Use of sobering cell, California Code of Regulations, Article 5, Section 1056. They actually mean this is part of Title 14. And then I'm reading now. A sobering cell is generally defined as a cell with a padded floor and standard toilet with a padded partition on one side for support. It must allow for maximum visual supervision of prisoners by staff for specific construction specifications referred to Uniform Building Code, Title 24, etc. Now, the next paragraph, this is the station manual, says, most station sobering cells built prior to current state standards have a hard floor, standard toilet, wash basin, drinking fountain, and a solid raised ledge or bench unless otherwise exempted by the State Board of Corrections. These sobering cells are out of compliance with current standards and should not be used. So they're specifically an anti-grandfather clause. But that's not about the audio or visual surveillance, that paragraph, is it? It doesn't explicitly refer to that. But it does refer to the fact that when these inebriants, and these are extremely intoxicated people, are put in a cell, there ought to be maximum visual supervision and audio monitoring. There was a representation made that there was no evidence on audio monitoring or it was in conflict. But the evidence at trial was absolutely clear. There is no speaker. There is no intercom. There is no way for an inmate, a prisoner who is put in a sobering cell, to summon a jailer for assistance other than by pounding on the window. And the evidence in this case, which was shown by the video out in the hallway, was that Mr. Castro, to try futilely to get the jailer, Solomon's attention, pounded on the window, this is highly visible, for a full minute. And Solomon chose not to respond to that. So if he had a monitor, an intercom, perhaps he could have told the jailers, hey, this guy you put in the cell with me is threatening me. He's putting his hands on me. I don't want to be in a cell with him. I'm afraid of him. That didn't happen because there was no audio monitoring. And your Monell theory is completely, what's different from your theory against Solomon and the other officers, right? Thank you, Your Honor. They're independent of each other and there is overlap. What Solomon and Valentine did was first they put Mr. Castro in this cell that they couldn't visually monitor. He was by himself, but that still was a dangerous situation because of health and other issues that can happen to an immigrant. Then, in violation of the rules, they put in Mr. Gonzalez, who had been classified as combative. And the rules are that combative people are not to be put in the cell with another person. They put Mr. Gonzalez in a cell where they knew there was no visual surveillance and no way for Mr. Castro to summon help if he did. And then, knowing that they didn't know what was going on in the cell, Solomon disregarded the pounding. And then Solomon sent this volunteer, Mr. Schiff. How is the county theory different? The county was responsible for giving them a cell that had no window and no intercom. If the other rules of the county had been followed, in other words, they had not put a combative person in a cell with another inebriated, another inmate. If they had come when summoned, if they had— So is your theory for the county then just based on the design of the cell? It's based on the use of the cell. It would be like putting a prisoner in an old paddy wagon that didn't have modern seatbelts and restraints. Mr. Burton, I'm having trouble following you. Could you tell us whether you think you're proceeding on a direct policy choice by the county not to put the needed equipment in the cell, or are you following a theory that there was a custom and practice which created a substantial risk? Is it a policy choice, or is it a custom and practice choice? I believe it's a custom and practice choice, and that's the way we— Do you know of any cases that have held with no liability custom and practice where there haven't been prior incidents of a similar kind? Absolutely. And what are they? Well, for example, Long v. City—County of Los Angeles. I think Gibson v. County of Washout fits in that category. And there's one more that's Farrelly v. Luman, which is another. Those are all jail cases. Are you saying it's so obvious—it should have been obvious that putting this person in the cell, notwithstanding the assault, a person just by himself in the cell would result in injury to him, a substantial risk of serious harm? Absolutely. And that's why in our record we begin with a series of still of photographs showing this—to me it looks like a dungeon. It's an absolutely sealed room. There's this one little slot that's blocked that they never used. There's this window that you can't see unless you walk right up to the window. I guess what's puzzling or confusing is he wasn't, in fact, hurt because he was put into this cell, which was not—let's just speculate that it wasn't to the regulation standard or it wasn't to a reasonable standard of visual monitoring. But he wasn't hurt by that. He was hurt because the individual officers violated the county's policy of not putting an assaultive prisoner with him or an assaultive detainee with him. So how do we separate out those two things? How can we say it was obvious that you couldn't put him by himself in the cell because of the substandard conditions of the cell? Thank you, Judge Ikuda. I think in this case it happened because they put an assaultive prisoner in with him. However, people who are so extremely intoxicated that they need to go into a sobering cell actually present a number of risks. For example, somebody can be so drunk they can pass out and aspirate on their own vomit. They can have a drug overdose in process that is being masked by their intoxication. People are thought to be extremely intoxicated when they're having seizures or diabetic issues. It's simply a whole series of problems that exist in the sobering cell. These are people who are just coming from the outside world and are not even booked. That seems like you're going back to the design, then. The way that the layout, it's the use of the cell, which did not have the adequate design. But there are other ways that the county could have avoided the risk once the county became aware that the design of this facility is not going to allow for maximum visual surveillance. You could, for example, not that you would want to, you could just post somebody outside the door, I'm booking that window 24-7, I guess, right? There are other ways to compensate for the poor design. That's why I just, this talk about the design and whether compliant with the regulations at the end of the day seems to be irrelevant. Your point that your expert made was that they only are checking on these people every 30 minutes and a lot can happen with people in this condition in 30 minutes. That's too long. That's basically the case you put to the jury, and the jury said, yeah, we agree, regardless of whether a combative indictment was put in there, even if your client had been in there by himself and then fell upon his head and suffered some kind of catastrophic injury, if that happened at minute one and they didn't get there for 30 minutes, that could have been the difference between life and death. That's why you need a greater level of visual surveillance. That's how I read your case. That's how we wrote our case, and thank you for reading it that way. A window could have been put in, there would have been some expense, but the wall of the sobering cell faces against that jail office, and it not only would allow the jailer to watch inside the cell, but would also alert the people inside the cell to the fact that they're being watched. Think of what happened in this case. Mr. Castro went to the door and knocked for a minute, and no one came to help him, and his eventual assailant saw that, that he was being isolated and he wasn't being protected, so a window would be the best solution along with an intercom, which is required. A lesser expense, which wouldn't allow for direct visual surveillance, would be just putting a video camera in the cell and then have the image appear on the monitor with the other images that are in the jail. This is done all the time and is a simple, inexpensive fix. That wasn't done, and had that been done, then presumably there would have been a recording of this assault, and they could have prosecuted this man, Gonzales, who was never arrested or prosecuted for really what almost resulted in Mr. Castro's death. Let me just follow up on Judge Acuda's question to you, though, because you mentioned that the harm in part was caused by the fact that a combative inmate was put in the cell with your client. Well, that certainly is not something the county is responsible for, right, because the county actually put in place a policy specifically to prevent that. It's just that its employees violated that policy. So as I understand your Monell claim, it really is focused— your claim would be exactly the same even if your client had just fallen, as I said, and hit his head. He'd been in there by himself, right? Yes, and he suffered damages, let's say, because he was there for 15 minutes before they found him. Right, so the jury's task from a causation standpoint was deciding, perhaps, whether even though there had been this violation of the county's policy, had it nonetheless had in place constitutionally adequate visual surveillance, would that have been enough to stop the harm? And apparently the jury found that it would have been, right? Yes. I mean, so it's a sufficiency question on causation when we get to that level, I assume. And the jury was instructed, like every jury, that there could be multiple proximate causes or legal causes of an incident. And here we argued that there were two legally sufficient causes, both the deliberate indifference of the jailer and his supervisor and the deliberate indifference of the county. I'd like to use, let's say, the rest of my time, if I could, just to address a couple things. How much time were you going to leave for your plan? I said 10 minutes. My plan was 10 minutes, which gives me 3 minutes and 19 seconds. I'd just invite the court's attention to what's in our record, a supplemental excerpt, Volume 1, 575. And this is the very beginning of our expert, retired lieutenant Roger Clark. Mr. Clark, is it your opinion, as stated in your Rule 26 letter, that the setup in the West Hollywood Jail is deficient because it did not provide a means for prisoners to be able to summon help? Answer, yes. When you reached that opinion, did you take into account all the provisions of Title 15 and Title 24, as you stated earlier? Yes, and cited such in my report. And there's no objection here. This came in the, we spent, I can remember spending a long time redacting Title 15 and Title 24 and the station manual, which explicitly incorporates those provisions to give to the jury something that didn't have a lot of extraneous stuff in it, you know, like the fact that they didn't have the padding next to the toilets they were supposed to have. But the theory is that there was a deliberate choice by a policymaker not to employ the regulations. It was a, yeah, it was a deliberate choice in the sense that they were told by the state to do this. They were told the reason is to protect the people in the sobering cell. Well, it's not a custom and practice case. We think it is. And they said we're just not going to bother doing it and we're just going to keep putting people in the cell that's not in compliance. Did the county object to it during Instruction 18? They only objected to the use of the term constitutionally. We went back and forth on the wording because the judge didn't want it just to go in as the form instruction where we'd be arguing about what was found. We'd be here, we'd know exactly what the theory is. And I remember Judge Fisher saying, well, why are you objecting to constitutionally? Because I remember when I was submitting that proposed instruction that I didn't want to later on encounter the argument that the instruction was deficient because it could have been interpreted as the standard is they were out of compliance with the California regulations and therefore they're liable. No, it has to be the constitutional standard, which is a deliberate indifference to a known risk. We look at it like this, and I'll just sum up if I could, that our theory was that there was a custom and practice of putting West Hollywood inebriants in a noncompliant cell. That the jury found was the proximate cause of this incident. And the evidence that supports the fact that the county was deliberately indifferent was the fact that they'd been told by the county, by the state, don't do this because it's too dangerous for people in the cell. You need to have maximum visual surveillance and audio surveillance. So who, and when you say they were told by the state, you're talking about the regulations? Right, and that the regulations, exactly, Judge Callahan, that the regulations were explicitly incorporated into the state's opinion. Now, were they retroactive? I mean, you said the jail manual was retroactive. Were those regulations applicable retroactively? They were enacted prior to this incident. Did every facility in the county have to get up to the standard of the regulations once the regulations were adopted? I would answer that yes. I would say that every type one detention facility in the state needed to make sure that their sobering cells had maximum visual surveillance and a call button. And did the regulations require that? That was the question about the grandfather clause. Yes. As far as I know, this is, I don't mean to be in any way disrespectful, but this is the first I've heard of the grandfather clause argument. I knew there was this anti-grandfather clause, and that's sort of what I was proceeding on, is that according to the regulations of the state of California, one can't do this. So if I could yield the rest of my time to Mr. Shapiro, unless the Court has any other questions. Thank you, Counsel. Thank you. Thank you, Your Honors. Good afternoon, and may it please the Court, my name is David Shapiro. I represent the Amici, and I'm going to be focusing on the Kingsley question. The state's miscontrols argument on that question, one might think that there's someone in this courtroom who's advocating a negligence standard. There isn't. The standard that the Amici advocate with regard to failure to protect claims brought by jail detainees is objective, deliberate indifference. That means ignoring an obvious and serious risk. It's also called, the city of Canton standard, it's also called civil law recklessness. None of those standards have ever been called negligence. They're much higher than that. And therefore, our proposed standard takes into account the fact that negligence isn't the proper standard here. So just that Mr. Burton says we don't need to get to the Kingsley issue to decide his case. So you're asking us to do something else, right? That he doesn't need? No, I agree with Mr. Burton on that question. I think that with regard to the individual claims, essentially it would be providing guidance to the bench and bar. With regard to the Monell claims, it came up in this manner. The logic of the panel's reasoning was that we have to apply the same standard to the Monell claims that we would apply to an individual claim. And therefore, because the farmer's objective deliberate indifference standard is the individual standard, we have to apply that to the Monell claims automatically. Well, let me ask you then, assuming the inquiry must be objective, is the question then whether a municipality's infringement on a constitutional right is so obvious as to reflect deliberate indifference? Yes, that's the standard. And specifically, the city of Canton's standard is that it may happen in light of the duties assigned to specific officers or employees that the need for more or different training, or in this case, the need for different policy, and the inadequacy so likely to result in the violation of constitutional rights that the policymakers of the city can reasonably be said to have been deliberately indifferent to that need. So it's an objective obviousness standard. If post-Kingsley, that's the standard, and the jury was misconstructed in this case, what's the consequence then? Well, there's no consequence as to the individual claims for this reason. What we're talking about is removing a subjective element and, in a sense, lowering the standard. And this has come up in two other contexts. The first was in the Supreme Court in Kingsley, Paul Clement argued for the jail set. Well, if you change the fourth standard, that means we get qualified immunity. Supreme Court ignored that argument. Seventh Circuit specifically reached it and rejected it on remand. Similarly, more veto is the Sixth Circuit case where Kingsley sort of came down mid-flight, so to speak, on the appeal, and that wasn't held to be a basis for qualified immunity. If one accepts the panel's logic that one applies the underlying individual standard to the Monell claim, it's another reason for affirming without evidence of subjective deliberate indifference. What do we do with our Clothier case after Kingsley? Is that still good law, either far or in Kingsley? No, after Kingsley you overrule Part 3 of Clothier. For this reason, Kingsley and Bell proclaim that detainees and convicts are different, and this Court should not treat them the same. Indeed, the Supreme Court has never in its history applied a subjective standard to a pretrial detainee, and Bell and Kingsley applied objective standards to a myriad of subject matter. Excessive force, double selling, access to expressive materials, access to personal items. Did Bell have a omissions over here? Did Bell have an omissions issue? So the Supreme Court said omission, that pretrial detainees are entitled not to suffer punishment, but it looked at the double selling and the like as actual intentional acts by the Court. It didn't address the sort of omission issues. Am I right on that? Kingsley was also an intentional, I think it was an excessive force type case, right? Right, it was an excessive force type case. So we don't really have a case that addresses that omission, a Supreme Court case that addresses that omission issue, except for Farmer. Is that correct? In a sense, Farmer says that it is cruel and unusual punishment to be subjectively, deliberately indifferent. But it's punishment. If you have an omission case, we don't know if there's punishment unless you're doing it on purpose. That's why it adopted the subjective intent. Isn't that the language of the case? Punishment is an omission case. Otherwise, it's just negligence. If you are meant to do something and you didn't know about it, the Court says it's negligent. And that's why you need to have subjective intent in order for it to be punishment. The Supreme Court says that it is cruel and unusual punishment if there is subjective, deliberate indifference. And what Kingsley says is that detainees are entitled to more than freedom from cruel and unusual punishment. It said they're entitled to not be punished. But Farmer is what defines punishment, as I read Farmer. Kingsley didn't define punishment, did it? It said you have a right to be free from the intentional application of force that is not rationally related to a legitimate governmental objective. Farmer says that subjective, deliberate indifference is cruel and unusual punishment. It said it was punishment. You couldn't have punishment without subjective intent. And then it says you can't have cruel and unusual punishment, which would violate the amendment. Freedom from punishment has to mean more than freedom from cruel and unusual punishment. That's what Kingsley, that's the proposition that Kingsley stands for. Well, how do you have punishment if there's an omission? I mean, because the Supreme Court was pretty clear that in an omission case, punishment requires a subjective element. In two ways. First of all, this is not an omission case. There was an intentional decision made to send Mr. Gonzalez into this dangerous cell. Not on the part of the county, though. Can we talk about the county in respect to Judge Acuda's question? Well, with respect to the county, if we're applying an objective, deliberate indifference standard, then it's well settled that constructive knowledge applies under that standard. So I think that's how it comes into the county as the, you know, if Kingsley changed the standard, then it would be an objective standard with regard to the county as well. And constructive notice would suffice. But I do want to go back to Judge Acuda's question about intent. And it wasn't an accident that they wound up in the same cell. His control said exactly right what Kingsley stands for. It says that it cannot be an accident. It wasn't an accident that they were sent to the same cell together. That was an intentional action. It wasn't an accident that the cell wasn't checked on. Nobody slipped on the banana peel on the way to the cell or meant to check on the cell but then didn't check on it. To the extent. That applies to the officers, but how does it apply to the county? My view is that even under pre-Kingsley law, the Monell standard is a city of Kansas standard, which is an objective, deliberate indifference standard. So regardless of what Kingsley says or does about the individual claims, the pre-Kingsley law establishes that it's an objective standard. Right. So how would you change the jury instructions case? Because the jury instructions alleges, and I'm just quoting the relevant part, that the county was deliberately indifferent to the substantial risk of serious harm to prisoners. Which is different from what you're saying? With regard to the county, no, I don't have any problem with the jury instruction for the county. And the jury found the county liable and that finding should be affirmed. So, I mean, when we're talking about Kingsley, basically we're talking about our jurisprudence, not what happened in this case or how the jury was instructed, right? With this qualification, the logic of the panel decision is that there is an underlying subjective, deliberate indifference standard for individual claims. And on pages 673 and 674 of the panel amended opinion, as it's printed in the Federal Reporter, the panel makes this move. We have to apply that underlying individual standard to the Monell claims. So for purposes of that move that the panel makes, it matters what the standard is for the underlying individual claims. The panel opinion is gone. I'm sorry? The panel opinion is gone now. And my view is that we're looking at this fresh. We look at the jury instruction. We look at the law as it applies. If we fold in Kingsley, it's analyzed on prior precedent. But, I mean, it doesn't sound like you were arguing for a different standard than this jury was instructed on. I am not. I believe it was the proper standard before Kingsley under the Monell law and the proper standard after Kingsley. Any other questions? Very good. We'll give you two minutes for a vote. Thank you for the time. Objective, deliberate indifference is not a constitutional violation. Under Board County Commissioners v. Brown, a plaintiff pursuing a direct Monell or custom practice claim has to establish the state of mind to prove the underlying constitutional violation. The underlying constitutional violation here requires objective and subjective intent. And in Farmer, and I would respectfully disagree with Mr. Shapiro, he's advocating a negligent standard. In Farmer, footnote 4, the Supreme Court calls this a civil recklessness. And it said that the common law deals with this type of objective standard. And it said that that doesn't constitute a base amendment violation, but it also does not constitute a 14th amendment violation. It's not a font to be superimposed for torts under the due process clause. There is no violation for an unintended injury under Davidson. What he is advocating is negligence, and even if it's a gross negligence. If we turn to the jury's instruction, the jury's instruction merely being negligent or failing to alleviate a significant risk that the defendant should have perceived but didn't does not constitute deliberate indifference. What's wrong with that? Well, first of all, Your Honor, respectfully, the entire Monell claim I would respectfully submit is improper because it respectfully does not comply with any established type of method of establishing a Monell claim. A custom and practice of using the spell does not establish deliberate indifference. But I was responding to your argument that basically the jury was allowed to make a verdict based on negligence and they were instructed otherwise, weren't they? Your Honor, when I was making that argument, it's in response to whether the standard has been changed on Kingsley or whether an entity can be proven liability with constructive knowledge. Now, I would submit that the gross negligence standard is not sufficient in L.W. Grubbs. They held gross negligence doesn't show deliberate indifference in the Section 1983 claim. And I also wanted to emphasize that the existence of a regulation does not establish deliberate indifference. The violation also doesn't show deliberate indifference because that's strict liability. It doesn't show constructive or actual knowledge in this case because we don't know what the original design was. There's nothing linking the county to know that its regulations are allegedly being violated because there's no prior incidents of harm. And it has a window looking right into the cell. At trial, the plaintiff didn't focus on it because there was some issue of whether it was actually in use or not, but it was part of the county's original design and there was also video monitoring of the cell and there was the radio monitoring that I referenced earlier. So I don't see how you could possibly establish a Monell claim in this case. There's been no deliberate indifference. And the defense counsel did object to the entire deficient Monell claim and the jury instructions at ER 151 to 152, 172 to 173. And the district courts in response with regard to whether this Monell claim stated a cause of action, the cases don't support it, but that doesn't mean I'm not going to give a jury instruction. So I would submit that, you know, the defense adequately preserved its objection to this entire Monell claim. And I see I'm over, but for qualified immunity against farmer itself states that even if there is a that the defendant knows of a substantial risk of serious harm and violates it, there can still be no violation if his conduct can be considered reasonably and qualified immunity is a separate analysis. And if one reasonable officer could have thought that their actions did not violate clearly established law, which is a fact-based inquiry, the defendants must be entitled to qualified immunity in this case. Thank you. Thank you so much. The case is heard. We submit our decision. And we will be at recess. Thank you.
judges: Thomas, Graber, Gould, Paez, Callahan, Bea, M. Smith, Ikuta, Watford, Owens, Friedland